IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY
PENNSYLVANIA

CIVIL DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*    No. CV-22-007978
                                    \*
**GLORIA GAYNOR**                      \*
                                    \*
        VS.                         \*
                                    \*
**DEL. CO. TAX CLAIM BUREAU**          \*
                                    \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Media, PA, March 28, 2023

\*\*\*

Regional Court Number 8

\*\*\*

TRANSCRIPT OF PROCEEDINGS

BEFORE:   THE HONORABLE JOHN J. WHELAN

          ROBERT HOLBER, ESQUIRE
          For Gloria Gaynor

          EDWARD HAYES, ESQUIRE
          For CJD Group

          SHERRI EYER, ESQUIRE
          For Tax Claim Bureau

York Stenographic Services, Inc.
2303 East Philadelphia Street, York, PA 17402 - (717) 854-0077

INDEX

DIRECT CROSS REDIRECT  RECROSS

ON BEHALF OF MS. GAYNOR:
Gloria Gaynor        31    35
Winston Granville    46    48

ON BEHALF OF CJD GROUP AND THE TAX CLAIM BUREAU:
Janine Heinlein      5    17    27

EXHIBITS

|  | MARKED | ADMITTED |
|---|---|---|
| ON BEHALF OF MS. GAYNOR: | | |
| P1 - Appraisal | 43 | 51 |
| | | |
| ON BEHALF OF CJD GROUP AND THE TAX CLAIM BUREAU: | | |
| R1 - Return and claim posting | 7 | 29 |
| R2 - Return green card for return and claim | 8 | 29 |
| R3 - Sheriff's affidavit of service | 8 | 29 |
| R4 - Notice of public sale | 9 | 29 |
| R5 - Copy of sheriff's return of service | 10 | 29 |
| R6 - Ten-day notice | 11 | 29 |
| R7 - Copy of posting placed in Delaware County Legal Journal | 12 | 29 |
| R8 - Copy of notice posted in Philadelphia Inquirer | 12 | 29 |
| R9 - Copy of notice published in the Spirit paper | 12 | 29 |
| R10 - Upset sale sheet | 12 | 29 |
| R11 - Copy of sale notice | 13 | 29 |
| R12 - Upset sale contact sheet | 14 | 29 |
| R13 - Copy of petition to confirm sale | 16 | 29 |
| R14 - Copy of confirmation issued by Judge Dozor | 16 | 29 |
| R15 - Copy of decree absolute | 16 | 29 |
| R16 - Home Equity Line of Credit | 41 | 51 |

York Stenographic Services, Inc.
2303 East Philadelphia Street, York, PA 17402 - (717) 854-0077

P R O C E E D I N G S

March 28, 2023

THE COURT:  Gaynor versus Delaware County Tax Claim, docket number 7978 of '22.  Counsel, please identify yourself and who you represent.

MR. HOLBER:  Good morning, Judge.  Rob Holber, again from the petition, Ms. Gaynor.  Ms. Gaynor is making her way up here and she is a little on the older side, if you'll give her time to do that please.

MR. HAYES:  Good morning, Your Honor.  Edward Hayes on behalf of the tax sale purchaser, CJD Group.

MS. EYER:  Good morning, Your Honor.  Sherri Eyer on behalf of the Tax Claim Bureau.

THE COURT:  All right Mr. Holber.

MR. HOLBER:  Can you sit right over here for me please?

MS. GAYNOR:  [Inaudible]?

MR. HOLBER:  Can you sit right next to me here?

MS. GAYNOR:  Okay.

MR. HOLBER:  Can you make it?

MS. GAYNOR:  Yeah, I'm good.

MR. HOLBER:  Okay, good.  Sit right here. Thank you.

MS. GAYNOR:  Okay.

MR. HOLBER:  Sit right there.

MS. GAYNOR:  Okay, sir.

MR. HOLBER:  Thank you.

THE COURT:  All right, if we can proceed please?

MR. HOLBER:  Judge, this is again another case with a petition for an upset tax sale.  There is a procedural issue that I don't think will be an issue at this point but I'll let Mr. Hayes speak to that as well. There's a pending Motion to Strike new matter which was filed on behalf of the intervener.  That motion haven't been ruled upon.  I don't think it's an issue but at this moment, but I wanted you to become aware that it was out there.

THE COURT:  Is there an issue that we need to address with that?

MR. HAYES:  Not as far as I'm concerned, Your Honor.  No.

THE COURT:  All right, that's dismissed then. Let's move on to petition to set aside the tax sale.

MR. HOLBER:  Thank you, Judge.  There may be issues again as to the notices that were required and we take the position that it's not our client's job to present what the tax [inaudible] shouldn't have done, so we'll wait to see what evidence that they put on, Judge.

THE COURT:  Okay, you ready...

MR. HAYES:  We're prepared to proceed, Your Honor.

THE COURT:  Okay, let's...

MR. HAYES:  Call Ms. Heinlein.

THE COURT:  All right, this -- Ms. Heinlein is still under oath from previous cases.

MR. HAYES:  May I proceed, Your Honor?

THE COURT:  Yes, please.

MR. HAYES:  Thank you.

***

JANINE HEINLEIN,

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

***

DIRECT EXAMINATION

BY MR. HAYES:

Q.  Good morning, Ms. Heinlein.

A.  Good morning.

Q.  By whom are you employed?

A.  Delaware County Tax Claim Bureau.

Q.  And for how long have you been employed by the Tax Claim Bureau?

A.  Seven and a half years.

Q.  And you're currently the upset sale coordinator?

A.    Yes.

Q.    And for how long have you held that position?

A.    Almost four years.

Q.    And in that position, are you responsible for ensuring that the Tax Claim Bureau complies with all of the statutory obligations for upset tax sales?

A.    Yes.

Q.    And are you familiar with the property of 335 Wayne Avenue Lansdowne, PA?

A.    Yes, I am.

Q.    And are you familiar with the upset tax sale of that property?

A.    Yes.

Q.    And when was that sale, ma'am?

A.    The upset sale was on September 22 of 2022.

Q.    And what years taxes were unpaid that resulted in that upset sale?

A.    2020.

Q.    And as a result of the failure to make payments, did the Bureau initiate the tax sale process?

A.    Yes.

Q.    Was a notice of return and claim sent out to the owner of the property?

A.    Yes.

                              ***

MR. HAYES:  May I approach, Your Honor?

THE COURT:  Yes, please.

MR. HAYES:  Copy of Exhibits for the witness, also for the Court.

MS. HEINLEIN:  Thank you.

MR. HOLBER:  [Inaudible].

MR. HAYES:  [Inaudible].

***

BY MR. HAYES:

Q.   Ms. Heinlein, do you have the Exhibit book?

A.   Yes, I do.

Q.   Would you turn to Exhibit 1 and can you tell the Court, is that a copy of the notice of claim that was sent out in connection with this particular property?

A.   Yes, this is the return and claim posting notice.

Q.   And that was sent to 335 Wayne Avenue Lansdowne, PA?

A.   This was, yes.  This was posted on the property.

Q.   Okay.  And is the -- well, let me ask you.  On -- you said it was posted.  Is that Exhibit 3?

A.   I'm sorry, I just want to double check with my records.  Yes.  Exhibit 3.

Q.   All right, let's go back to Exhibit 1, Ms. Heinlein.  It says at the top...

A.   I'm sorry.

York Stenographic Services, Inc.
2303 East Philadelphia Street, York, PA 17402 - (717) 854-0077

Q.    ...Certified Mail.  Do you see that?

A.    Yes.

Q.    Okay, so that would have been sent to Ms. Gaynor?

A.    Yes, Ms. Gaynor.

Q.    And it would have been sent by Certified Mail, correct?

A.    Correct.

Q.    Okay and would you turn to Exhibit 2 and can you tell the Court what Exhibit 2 is?

A.    Exhibit 2 is the return green card for the return and claim.

Q.    So that was received back from the post office?

A.    Yes.

Q.    And despite the fact that you received the signed green card, the Tax Claim Bureau went forward and actually posted the notice of return and claim on the property, correct?

A.    Correct.

Q.    And that took place on December 7 of 2021?

A.    That is correct.

Q.    And the sheriff's affidavit of service is what's marked as Exhibit 3, correct?

A.    Correct.

Q.    Now, did the service of the notice of return and claim result in the payment of the taxes?

A.   Yes.

Q.   It did?

A.   I'm sorry, can you...

Q.   Sure.  Did the service of the notice of return and claim result in Ms. Gaynor paying the taxes?

A.   No.  No payment was made.

Q.   As a result, did the Tax Claim Bureau move forward to the next step in the process?

A.   Correct.

Q.   And that's the sending of a notice of public sale to the owner of the property?

A.   Yes.

Q.   And did the Tax Claim Bureau do that in this case?

A.   Yes.

Q.   And how is that sent out, ma'am?

A.   A certified restricted delivery certified letter is mailed to the property mailing address of 335 Wayne Avenue Lansdowne, Pennsylvania.  We also had the sheriff go out and post the property, make personal service again at the property located at 335 Wayne Avenue and a final ten-day notice mailed first class mail.

Q.   Okay, let's look at Exhibit 4.  First, Ms. Heinlein, is that a copy of the notice of public sale that was sent certified mail return receipt requested restricted delivery?

A.   Yes.

Q.   And is the second and third page of Exhibit 4 a copy of the proof of mailing with the post office?

A.   Yes, it is.

Q.   And Exhibit 5, you mentioned that the Tax Claim Bureau posted the property.  Is Exhibit 5 a copy of the sheriff's return of service?

A.   Yes.

Q.   Indicating that the property was posted on July 21, 2022, correct?

A.   Correct.

Q.   And the second page of that Exhibit, ma'am, would that be a copy of the notice that would be posted by the sheriff?

A.   Yes.

Q.   And if you go back to the first page of Exhibit 5, there's also an indication that the sheriff made personal service of the notice of sale upon Ms. Gaynor, is that correct?

A.   Correct.

Q.   And that was done on the same date?

A.   Yes.

Q.   Now, you testified previously that despite the fact that the property was posted, you also sent out the ten-day notice, correct?

A.   Correct.

Q.   And is the ten-day notice Exhibit 6 in the book, ma'am?

A.   Yes.

Q.   And attached to Exhibit 6, is there also a copy of the proof of mailing?

A.   Yes.

Q.   And I believe you testified in some earlier proceedings that you physically take all of the first class mail notices down to the Media Post Office, correct?

A.   Yes.

Q.   And did you do so in this case?

A.   Yes, I did.

Q.   And was the first class mail letter that you sent to Ms. Gaynor returned back to your office?

A.   No, it was not.

Q.   So, as a result, were you of the belief that that letter had been received by Ms. Gaynor?

A.   Yes.

Q.   Now, the Bureau also has an obligation to publish notice of the tax sale, Ms. Heinlein?

A.   Yes, that is correct.

Q.   And did it do so in this case?

A.   Yes.

Q.   Okay, would you look first at Exhibit 7?  IS that a copy of the posting that was placed in the Delaware County Legal Journal?

A.   Yes, it was.

Q.   And would you look at Exhibit 8 and can you tell the Court if that's a copy of the notice that was posted in the Philadelphia Inquirer?

A.   Yes.

Q.   And is Exhibit 9 a copy of the notice that was published in the Spirit paper?

A.   Yes.

Q.   Now, would you turn to Exhibit 10, ma'am, and can you explain to the Court what Exhibit 10 is?  It's a three-page Exhibit.

A.   Exhibit 10 is the upset sale sheet where we calculate the grand total for the opening bid and it will show the delinquent tax amount and the current year tax amount of 2022, the grand total of the opening bid was $14,419.  The second page is a receipt given to the bidder at the time that the upset tax sale was finalized by the purchaser in the amount, again, of $14,419.  The third page of Exhibit 10 is the front page of the upset sale sheet and it will show who was the owner at the time of tax sale, description of the property, and the fees and costs, such as the state transfer tax fees,

recording fees, title fees, a deed acknowledgement, and deed prep.

Q.   So, is it your testimony, Ms. Heinlein, that when my client purchased the property, they purchased it for the upset price set by your office?

A.   Yes.

Q.   And that's the $14,419?

A.   Yes.

Q.   Ms. Heinlein, and my client paid the full purchase price of the property, correct?

A.   Yes.

Q.   After a sale takes place, the Tax Claim Bureau is obligated to send a notice to the former owner of the property indicating that their property was sold at the tax sale, correct?

A.   Yes.

Q.   Did the Tax Claim Bureau do that in this case?

A.   Yes.  Notice was sent by first class mail and certified.

Q.   Okay, would you look at Exhibit 11, ma'am, and can you tell me -- excuse me, is that a copy of the notice that was sent to Ms. Gaynor advising her that the property had been sold?

A.   Yes.

Q.   Now, despite the fact the property had been

personally -- or Ms. Gaynor had been personally served, did your office also undertake additional efforts to be sure that the address you had for Ms. Gaynor was correct?

A.    Yes.

Q.    What did you do?

A.    We searched four different Board of Assessment records, Recorder of Deeds, we searched True People, and a Google Spokeo search.

Q.    And is Exhibit 12, ma'am, the upset sale contact sheet that evidences what you did?

A.    Yes.

Q.    And did all of those investigations that you undertook disclose that the 335 Wayne Avenue was the proper address for Ms. Gaynor?

A.    Yes.

Q.    Now, prior to the sale actually taking place, did your office receive a communication regarding the sale?

A.    Yes.  The contact, it was July 26 of 2022.  It was -- the contact person was with a cashier in my office, Samantha Stevens [ph].

Q.    And is that reflected on the upset sale contact sheet?

A.    Yes.

Q.    And is it the practice of your office,

Ms. Heinlein, that when you receive any type of
communication from the tax payer or anyone on the tax
payer's behalf that a notation of that is made in the
file?

A.    Yes.

Q.    And do you see that this particular person
indicated they were calling on behalf of Ms. Gaynor?

A.    Yes.

Q.    And a request was made for a phone number for Ms.
Gaynor and the person responded that she had a heavy
Jamaican accent and won't answer the phone, so they
would not provide a phone number, correct?

A.    Correct.

Q.    And did your office provide the individual with the
information regarding what year's taxes were unpaid, the
amount that was necessary to take the property off the
tax sale list, and the date by which they had to be
paid?

A.    Yes.

Q.    And is that all reflected in Exhibit 12?

A.    Yes.

Q.    And does Exhibit 12 also include, ma'am, from your
file the results of the Spokeo search and the true
person search?

A.    Yes, it does.

Q. Now, after the sale was completed, ma'am, did the Tax Claim Bureau or Ms. Eyer on behalf of the Tax Claim Bureau file a petition to confirm the sale?

A. Yes.

Q. And is Exhibit 13 a copy of the petition to confirm the sale?

A. Yes.

Q. And was the sale confirmed in an order issued by the Court?

A. Yes.

Q. Would you turn to Exhibit 14, Ms. Heinlein, and can you tell the Court, is that a copy of the confirmation that was issued on November 22 by Judge Dozor?

A. Yes.

Q. And then finally, was that decree made absolute at some point in time?

A. Yes.

Q. And is Exhibit 15 a copy of the decree absolute that was issued in connection with this sale?

A. Yes. It was issued on December 21 of 2022.

Q. Ms. Heinlein, from your review, and you did review the file for preparation for this hearing today, did you not?

A. Yes, I did.

Q. And from your review of the file, is it your

opinion that the Tax Claim Bureau fulfilled all of its statutory obligations under the Real Estate Tax Sale Law?

A.   Yes.

Q.   And in fact, did they go even further than the obligations that are set forth in the tax sale law in an attempt to provide Ms. Gaynor with notice of the sale?

A.   Yes.

                          ***

          MR. HAYES:  No other questions, Your Honor.

          THE COURT:  Mr. Holber?

          MR. HOLBER:  Thank you.

                          ***

                    CROSS EXAMINATION

BY MR. HOLBER:

Q.   Ms. Heinlein, I'd like you to look at Exhibit 1 please.

A.   Okay.

Q.   Let me know when you've gotten there.

A.   Okay, I'm there.

Q.   You've indicated in your testimony that this Exhibit was sent, I believe my notes say certified in regular U.S. postal mail, is that correct?

A.   No.  For Exhibit 1, this was a copy of the return and claim that was sent by certified mail.

18

Q.   It was sent by certified mail?  Could you show me the proof of the certified mailing, please?

A.   The proof will be downstairs in my office via our billing coordinator.

Q.   So, you have no proof today at the hearing?

A.   Not today.  It's downstairs in the Tax Claim Bureau.  I can provide that proof if you'd like.  I can get that proof...

Q.   No, I don't...

A.   ...if you give me a few minutes.

Q.   No, you knew about the hearing today obviously, correct?

A.   I did but it's not really natural for me to have copies of proof of mailings for the return and claim. We do have copies and I'm sure Sherri can state that yes, it's not really relevant.

Q.   You prepared the file for today?

A.   I did. I prepared all the upset sale files.

Q.   I'd also like you to turn to Exhibit 2 if you would please.  Let me know when you've gotten there.

A.   I'm there.

Q.   I'm looking at it and my reading of this is that mail was sent certified mail, not certified mail restricted.  Could you clarify that?

A.   Right, that is correct.  Again, this is the return

and claim.  Return and claim is when the new taxes are liened [ph] into our office.  We are required per the statute to mail out a certified letter regarding the new claim.

Q.   So, it was only sent by...

A.   For a return...

Q.   ...certified, not certified and restricted, correct?

A.   For a return and claim, it's only certified letter. For tax sale notices, it's certified restricted.

Q.   Okay, let's look to number 4 if you'll turn to that Exhibit.  How was that notice sent out?

A.   This is a notice of tax sale certified restricted delivery.

Q.   And the Exhibit I'm seeing, I don't see any evidence of any type of mailing other than the, what looks like a copy of the notice itself.  Do you see any?

A.   We did not get an answer back from the certified restricted delivery letter, so I don't know.  I mailed it, I physically take it to the post office.  I can't say what happened to it after.

Q.   Well ma'am, on Exhibit...

A.   So, I...

Q.   I'm sorry.  I didn't mean to interrupt you.

A.   So, I provided the proof of mailing to state yes, I

did file per the statute.

Q. On Exhibit 1 you were able to provide a copy of what I would call a green card but I don't see one of those for Exhibit 4. Am I correct?

A. You are correct because again, we did not get no response back from the tax sale notice certified restricted delivery.

Q. You don't make copies of the green cards before you send them out so that you can show evidence that how they were sent?

A. No, because I send out over six thousand pieces of tax sale notices.

Q. And how would you know if it was certified -- other than your standard practice, certified or certified restricted?

A. Well one, because of that's what the statute requires...

Q. Um-hum.

A. ...and two, our computer system automatically cerates that posting for -- that mark for it to state certified restricted delivery and when it does not, I physical mark it myself to make sure that yes, it is certified restricted delivery.

Q. But it doesn't say that anywhere on that I can see [inaudible]...

A.   Again, this is only a copy but I have the proof of the mailings.

Q.   Do I see it in any of the Exhibits?

A.   It is behind the copy of Exhibit 4, page two and page three.  It is the proof of mailing.

Q.   But that's not proof that it's restricted certified is it?

A.   No, it's showing that there is a proof of mailing. Done.

Q.   But again, not restricted certified, correct?

A.   It was restricted delivery...

Q.   Ma'am, does it show that?

***

MR. HAYES:  Objection, Your Honor.  The document speaks for itself.

THE COURT:  I'm going to sustain the objection to allow the witness to respond but overrule it to the contents.  I'll allow the witness to respond.

MS. HEINLEIN:  Can you repeat the question please?

***

BY MR. HOLBER:

Q.   Does it show in the Exhibit anywhere where the notice was sent certified restricted?

A.   No.  It does not.

Q.   I'm also looking at Exhibit 5 and what I'm looking at appears to be an original document.  Would I -- would Mr. Hayes have the original documents from the Tax Claim Bureau?

A.   No.  He will not have the original document.  I have the original document and I have the original today in court with me.

                              ***

MR. HOLBER:  May I show this?  May I approach, Judge?

THE COURT:  Sure.  I believe what you're showing her is a color copy but please proceed.

MR. HOLBER:  That's what I didn't understand.

THE COURT:  Okay.

MR. HAYES:  And I can represent to the Court that's exactly what it is.

MS. HEINLEIN:  This is the original.

MR. HOLBER:  Thank you.

MS. HEINLEIN:  Did you want to see how...

THE COURT:  No, that's fine.  I understand what it was.

MR. HOLBER:  I want to make it clear; I wasn't suggesting Mr. Hayes...

THE COURT:  No, that's fine.

MR. HOLBER:  ...did anything incorrect...

THE COURT:  I understand.

MR. HOLBER:  ...I just didn't understand.

***

BY MR. HOLBER:

Q.   Now, looking at the records, ma'am, how much tax was actually owed by Ms. Gaynor?

A.   At the time of the upset sale, it was delinquent for the 2020 school tax but the total balance due of $3,509.39.

Q.   $3,509.39?

A.   Correct.  Yes.

Q.   And if anyone, including me, had walked into your office before September 22 of last year, you would have -- your office would have taken the property off the tax sale list?

A.   If it was paid in full, yes.

Q.   All right.  And I'm sorry, which tax -- was 2021 that was owed?

A.   2020.

Q.   2020.  Was 2021 paid?

A.   That was not delinquent so I would state that it was paid in the current year.

Q.   How much is the total tax of the property?

A.   The total balance due at the time of tax sale to remove the property from the upset tax sale was

delinquent was the 2020 school taxes in the amount of $3,509.39...

Q.   I'm sorry, I asked the question probably so it was hard to understand.  Do you know the total tax due if it was paid in the ordinary course every year for that property?

A.   No, and if it was paid in the current year, no I do not.

Q.   If the calendar year 2021 was paid, how did your office know how to apply it?  Why didn't it apply it to the 2020 instead of the 2021?

A.   I'm sorry.  I'm confused.

Q.   You've indicated that as far as you know, the 2021 taxes are not delinquent, correct?

A.   Right, because they were not liened in to our office for a claim for 2021 taxes.

Q.   And is it fair to say those 2021 taxes are as least as much as $3,500?

A.   I cannot state because, again, for the 2020 taxes, it was only showing delinquent for the school.  It's not including the township or the county taxes.

Q.   Okay, so assuming what you know, because that's all you can do, if the -- how would your office -- how would the tax authorities know how to apply payments that are made during 2021?

25

A.    We did not collect 2021 taxes.  They were not liened in to our office for collection on the 2021 taxes.  So, that's why I stated, I would presume that they were paid in the current year [inaudible]...

Q.    In 2021?

A.    Correct, yes.

Q.    Okay, so if the taxes were paid in 2021, and there were taxes owed for 2020, I physically walk in and pay 2021, how would the taxing authorities know which year to apply it to?

A.    Well, because our system, you come in and made a payment at the time of tax sale, just for say for $2,000, we would put it in for our system and it would automatically be applied to the year that is the delinquent or the earliest year that is delinquent.

Q.    So, if we're presuming that 2021 was paid and the tax year in which the sale took place was for 2020, why wouldn't the money paid for 2021 have been applied...

A.    Because the...

Q.    Let me finish the question please.

A.    I'm sorry.

Q.    Have been applied to what you've already told us it should have been, the 2020?

A.    Because the 2021 taxes were not paid to our office. They were paid with the taxing authorities in the

current year, so I would presume that the county taxes in 2021 were paid directly to the Delaware County Treasurer's Office, the township taxes were paid directly to the township of Upper Darby, and the school taxes of 2021 were paid directly to the Upper Darby School District.

Q.   I understand.  Thank you for that clarification.

A.   Sure, and I'm sorry for the confusion.

Q.   No, not at all.  I'd like you to look at Exhibit 12 please and let me know when you've gotten there.

A.   I am there.

Q.   This is the contact sheet, correct?

A.   Correct.

Q.   Does this indicate that Ms. Gaynor herself called the office at any time?

A.   No, it's indicating that Dave Josselin [ph] called on behalf of Gloria [ph].

Q.   Do you know who Dave Josselin is?

A.   I do not.

                          ***

        MR. HOLBER:  No further questions, Judge.

        MR. HAYES:  Just briefly if I may, Your Honor?

        THE COURT:  Sure.

                          ***

                  REDIRECT EXAMINATION

BY MR. HAYES:

Q.   Ms. Heinlein, would you turn back to Exhibit 1, the notice of return and claim?  Just so there's no confusion, ma'am, is it your testimony that the notice of return and claim need only be sent by certified mail, not by certified mail restricted delivery under the tax sale law?

A.   That is correct.

Q.   And is that in fact what you did?

A.   Yes.

Q.   And while Mr. Holber complained that you didn't have proof that it was sent by certified mail, is the best proof that it was sent by certified mail Exhibit 2, which is the certified mail return receipt card for that letter?

A.   Yes.

Q.   Now similarly, Mr. Holber complained as to Exhibit 4, that the post office listing of all of the letters you sent out didn't have the words restricted delivery on it, do you recall that?

A.   Yes.

Q.   And it's your testimony you have absolutely no doubt in your mind that all of the notices of public sale that were sent out for this particular tax sale were sent out by your office certified mail restricted

delivery as required by the Tax Claim Bureau?

A.    That is correct.

Q.    No question in your mind whatsoever, correct?

A.    No question.

Q.    And that the form that the post office gives you here with the stamp doesn't note whether it's first class mail, certified, or restricted, it just acknowledges you brought in all of those letters?

A.    Yes.

Q.    And on this particular list is one of the letters going to Ms. Gaynor, correct?

A.    Correct.

Q.    Now, Mr. Holber had also asked you if somebody had walked in prior to the sale and paid the delinquent taxes, you would have removed the sale -- or the property from the sale, correct?

A.    Correct.

Q.    And isn't that the whole purpose of sending the notices out by your office that you would prefer people to come in and pay the taxes as opposed to exposing the property to public sale?

A.    Yes.

Q.    And in this case, did anybody, Mr. Holber, Ms. Gaynor, anyone else come in after receiving notice of the tax sale and pay the taxes?

A.   No.

Q.   As a result, did you have any recourse other than to move forward with the sale of the property?

A.   Correct.

                              ***

          MR. HAYES:  Nothing further, Judge.  Thank you.

          THE COURT:  Anything else, Mr. Holber?

          MR. HOLBER:  No, sir.  Not for this witness.

          THE COURT:  You may step down.

          MS. HEINLEIN:  Okay.  Thank you, Your Honor.

          THE COURT:  Any other witnesses?

          MR. HAYES:  Judge, I would have no other witnesses.  I would just move for the admission of Exhibits 1 through 15 in the booklet.

          THE COURT:  Any objection?

          MR. HOLBER:  No, sir.

          THE COURT:  Okay, we're going to -- the booklet has been marked as R1 as a comprehensive booklet with all the Exhibits and that will be made part of the record.

          MR. HAYES:  Thank you, Judge.  And we have nothing further on behalf of the Respondent.

          THE COURT:  Mr. Holber, do you have anything?

          MR. HOLBER:  I do, Judge.  I'd like to call

Ms. Gaynor.  She's a little...

THE COURT:  She can remain seated next to you and...

MR. HOLBER:  Okay.  Thank you, Judge.

THE COURT:  ...we'll swear her in though, nevertheless.  Does she understand the importance of the oath?

MR. HOLBER:  I will ask her that.

THE COURT:  Okay.

MR. HOLBER:  Do you understand that I'm going to ask you some questions and that they're going to swear you in where you will say...

THE COURT:  Mike.  You're going to swear the witness in please?

MR. HOLBER:  ...you will tell the truth under penalty of perjury.  You have to tell the truth.  Do you understand that?

MS. GAYNOR:  Yeah.

MR. HOLBER:  Okay, so he's going to swear you in but what I need you to do is speak loud enough so the Judge can hear you, okay?

MS. GAYNOR:  Um-hum.  Okay.  Go ahead and listen to what [inaudible].

THE CLERK:  Raise your right hand.  State your full name.

MS. GAYNOR:  Gloria Gaynor.

THE CLERK:  Spell your last name.

MS. GAYNOR:  G-a-y-n-o-r.

[Witness Sworn]

THE COURT:  The Court recognizes that she's going to affirm.  That's satisfactory to the Court.  Please proceed.

MR. HOLBER:  Thank you, Judge.

***

GLORIA GAYNOR,

having been first duly sworn, was called as a witness herein and was examined and testified as follows:

***

DIRECT EXAMINATION

BY MR. HOLBER:

Q.   Ms. Gaynor, where do you live?

A.   335 Wayne Avenue.

Q.   Okay.

***

MR. HOLBER:  Can you hear, Judge?

MS. GAYNOR:  [Inaudible] Pennsylvania.

THE COURT:  I'm having a little bit of trouble.

MR. HOLBER:  Okay.

THE COURT:  Maybe if you lower the mask or

move the microphone or?

MR. HOLBER:  Do you mind?

MS. GAYNOR:  All right, yes.

UNIDENTIFIED SPEAKER:  Bring the chair closer.

MR. HOLBER:  Bring it closer to here, so...

MS. GAYNOR:  No, my knee.  Wait, my knee.

MR. HOLBER:  Oh [inaudible] her knee.

MS. GAYNOR:  My knee.

MR. HOLBER:  All right.  You let me know when you're ready.

MS. GAYNOR:  Okay.  [Inaudible].

MR. HOLBER:  There you go.

MS. GAYNOR:  Okay.  Good.

MR. HOLBER:  Good.  Speak right into here.

MS. GAYNOR:  Okay.

                    * * *

BY MR. HOLBER:

Q.  So, could you tell us where you live?

A.  335 Wayne Avenue Lansdowne, PRIVATE ACTORS 19050.

                    * * *

MR. HOLBER:  Is that loud enough, Judge?

THE COURT:  Sure, I can hear her.

MR. HOLBER:  Thank you.

                    * * *

BY MR. HOLBER:

York Stenographic Services, Inc.
2303 East Philadelphia Street, York, PA 17402 - (717) 854-0077

Q.   And how long have you lived there for?

A.   Twenty one years plus.

Q.   And do you know why we're here today?

A.   Kind of.  Not all together understand.

Q.   Okay.  Is English your first language?

A.   English.  English.

Q.   And are you originally from the United States?

A.   No, I'm from Jamaica the British West Indies.

Q.   Now, can I ask how old you are?

A.   Eighty nine years gone.

Q.   And in the past few years, have you had someone to help you around the house?

A.   No.

Q.   Okay, who is Mr. D?

A.   Mr. D?  My past neighbor for twenty years.

Q.   And up until a few years ago, did he help you with paperwork and things?

A.   Mr. D, yes.

Q.   And do you know about when he stopped doing that?

A.   I think the last paperwork Mr. D did was [inaudible] I think some time last year.

Q.   Last year?

A.   I think so.

Q.   Okay and did you hear the testimony of the young lady that was up in the stand this morning?

A.   So far, yes.

Q.   Yes.  Now, one of the things she said was somebody posted something on your house.  Do you remember ever seeing [inaudible]...

A.   I remember nothing on the house, the door, or nothing.  Period.

Q.   Never remember seeing it?

A.   Nothing.

Q.   Do you live there alone?

A.   Yes.

Q.   Now I'm going to show you what's been marked as Exhibit 2.  Do you see that?

A.   Okay, yes.

Q.   Is that your signature next to the X?

A.   I didn't sign anything yet so far.

Q.   Okay.  And do you remember ever receiving any kind of a notice of a tax sale?

A.   I think the tax sale that came, I think was when I realized that late property was sale.  I think so.

Q.   That was after it was sold?

A.   Yes.

Q.   Do you remember being served by a sheriff?

A.   Nobody.

Q.   Do you -- how do you receive your regular postal mail?

A.   I have the door have a slot that the mail man would put it in and it would fall in between the screen door and the house door and I would take that from there.

Q.   Did you find in the past few years, it was a change in who delivered the mail?

A.   They had different mail carrier.  The original mail person I guess retired and there would have different young girls, young boys, whatever to deliver your mail.

Q.   And did you find that your mail was being delivered to a place at times other than your front door?

A.   It was more likely always at the front door if they do deliver there.

                         ***

     MR. HOLBER:  I have no further questions, Judge.

     THE COURT:  Any cross examine?

     MR. HAYES:  Briefly, Your Honor.  Thank you.

     THE COURT:  Okay.

                         ***

          CROSS EXAMINATION

BY MR. HAYES:

Q.   Good morning, Ms. Gaynor.  Can you hear me?

A.   Yes, sir.

Q.   Does anyone live with you, ma'am?

A.   No, sir.

Q.   Okay and you indicated a Mr. D.  Do you know his name other than Mr. D?

A.   David Josselin.

Q.   David Josselin.  So, David Josselin helps you out with matters?

A.   Yes, if I do need help, Mr. D will do it.  I call him Mr. D.

Q.   Okay and Mr. D lives close to you?

A.   Not now.  Not anymore.  He moved away.  But he used to live -- I live there and he lived across there at 336 and I'm at 335 Wayne.

Q.   Okay.  So, Mr. D used to live across the street but he's not there anymore?

A.   336 Wayne Avenue.

Q.   Okay.  Now Ms. Gaynor, on July 26, two months before the tax sale, Mr. D called into the Tax Claim Bureau to find out why you had received a notice of tax sale.  Do you recall having a discussion with him about...

A.   Yes, Mr. D did that for me.

Q.   Okay.  So, by July 26 of 2022, you were aware that the property was going to go to tax sale unless you did something?

A.   I didn't understand about tax sale [inaudible]...

Q.   Okay, but you got some kind of notice that you

discussed with Mr. D and you asked him to help you out?

A.    Mr. D, whatever he did was pertaining to, like, he said school tax, not property tax.

Q.    All right.

A.    School tax.

Q.    Okay, but my question is, you received some type of paper that talked about the school taxes and you spoke to Mr. D because you didn't understand and you asked him to find out for you.  Is that a fair statement?

A.    I would say so.

Q.    Okay.  And then Mr. D got back to you at some point in time and told you that the taxes had not been paid?

                              ***

        MR. HOLBER:  Objection [inaudible]...

        MS. GAYNOR:  He didn't say...

        MR. HOLBER:  Hold on.

        THE COURT:  What's your objection?

        MR. HOLBER:  He's asking for hearsay, Judge.

        THE COURT:  That is correct, you are.  Sustained.

        MR. HAYES:  Well...

        THE COURT:  You can rephrase it.

        MR. HAYES:  Sure.

                              ***

BY MR. HAYES:

Q. After you asked Mr. D to help you with that paper that you got regarding taxes, did he tell you what he found out?

***

MR. HOLBER: Again, objection, Your Honor.

THE COURT: Overruled. [Inaudible]. But he's not asking what he said, just that he told her what he found out so to that extent, it's overruled. If there's another question, you may then renew your objection if you so desire.

***

BY MR. HAYES:

Q. Did you have a conversation with Mr. Josselin what he found out after you asked him to look into this for him?

A. Not to my knowledge to remember saying anything pertaining to that.

Q. Well, when you asked him to look into it for you, did he do that as far as you know?

A. I'm not quite sure if he did or he said for me to do so.

Q. Well, do you remember learning that you had to pay a certain amount of money prior to September 22 in order to stop the property from going to sale?

A. I didn't get any notice to pay any money to stop

the property from going to sale.

Q.   That wasn't my question, ma'am.  Did you learn from Mr. Josselin anything at all about what he had discussed with the Tax Claim Bureau?

A.   I don't understand it to be honest.

Q.   You don't understand my question or you don't remember?

A.   No, I don't understand, sir.

Q.   Okay, let me try to -- it again.  I don't want to belabor this, Judge, but let me try.  So, you had some conversation with Mr. D who helped you out with things about a paper you had received about taxes.  Am I right so far?

A.   Yes.

Q.   And you asked him to find out for you?  Right?

A.   He did it on his own to do it for me.  I didn't definitely ask him.  He did it but he realized that I didn't understand.

Q.   Okay but this is -- he was doing things for you? He helped you out?

A.   Yes, sir.  Yes.

Q.   So, you told him about the taxes and then he did something on his own without you asking him, is that what happened?

A.   I think that's how it went, yes.

Q.   Okay.  And my question is, did he ever get back to you and speak to you about what he had learned from speaking with the Tax Claim Bureau?

A.   He called me back and tell me...

Q.   All right.

A.   ...I should get I think I guess get a lawyer, somebody like that.  Somebody to help me out with it.

Q.   Okay.

A.   Because he didn't -- he wasn't able to go forward doing it for me.

Q.   Okay.  But after you received that notice, you did not pay the taxes, right, for that year?

A.   I didn't pay any money.

Q.   Okay.  Ms. Gaynor, do you recall taking out a mortgage on the property?

A.   A mortgage?  [Inaudible].  I don't have a mortgage on it.  No.  I had [inaudible].

                          ***

     MR. HOLBER:  You got to speak up so the Judge can hear you.

     MS. GAYNOR:  [Inaudible] saying I had a mortgage but I think I paid off.

                          ***

BY MR. HAYES:

Q.   Okay, well the public records, ma'am, reflected

that you had two mortgages on the property.  One was paid off...

A.    Um-hum.

Q.    ...and the other is a line of credit mortgage that was not paid off.  Do you recall two mortgages?

A.    I know I had one, you call it, equity loan, is that you call it [inaudible]?

Q.    That's the one I'm asking you...

A.    Equity loan.

Q.    Right.

***

MR. HAYES:  And may I show the witness, Your Honor?

THE COURT:  Sure.

MR. HAYES:  [Inaudible] show.  Would you show her this please?  I have a copy for [inaudible] marked as R16 just...

THE COURT:  Okay.

***

BY MR. HAYES:

Q.    Ms. Gaynor, would you look on the fourth page for the back...

A.    Could you turn it for me please?

Q.    And do you see there's a signature about a third of the way up on the left?

A.    Yes.

Q.    Is that your signature?

A.    Yes.

Q.    Okay, now this is the home equity mortgage that I just asked you about.  So, does this help refresh your recollection that you took out a $50,000 line of credit home equity mortgage?

A.    I did but I've paid down to twenty -- about twenty nine or something thousand.

Q.    Okay, so your best recollection at this point in time is that there's about $29,000 that's owed on that?

A.    Yes, sir.

Q.    And do you make regular payments on that, ma'am?

A.    Yes, sir.

                          ***

            MR. HAYES:  That's all I have, Judge.  Thank you.

            THE COURT:  Anything else, Mr. Holber?

            MR. HOLBER:  Not for this witness, Judge.

            THE COURT:  Okay.

            MR. HOLBER:  I have two other witnesses.  One we may [inaudible].

            MR. HAYES:  What's that?

            MR. HOLBER:  May I keep this?

            MR. HAYES:  Sure, yeah.

MR. HOLBER:  One of them might be able to stipulate to, the other one will be very short.

THE COURT:  Okay, what can you stipulate?  I have to hear from Counsel if there's a stipulation.

MR. HOLBER:  I have an appraisal proffer that I can hand in.  Mr. Hayes.  I have the appraiser here as well who will testify as to the value of the property as of the date of the tax sale.

THE COURT:  Any contesting that issue, Mr. Hayes?

MR. HAYES:  Your Honor, I think similar to the stipulation that was entered into previously, I would accept Mr. Holber's offer of proof that if the witness testified, he would testify to what's in the appraisal, obviously without acknowledging that it's a valid or legitimate evaluation, but certainly that that's what he would testify to.

MR. HOLBER:  All right, unless Counsel is going to stipulate as to the value, I can't stipulate to it, Judge.  Either we agree that's the value or we don't.  There's no sidesteps here.  I have the appraiser here if you want [inaudible]...

THE COURT:  Well, here's the bottom line.  If he says that's what he's going to testify to and there's no contradictory evidence, I'm going to accept that...

MR. HOLBER:  That's fine.

THE COURT:  ...as the value of the property.

MR. HOLBER:  That's fine.

THE COURT:  So, we can accept your stipulation and the Court is going to recognize the appraiser is the only evidence of value of the property in this case thus far, so you can hand that up.

MR. HOLBER:  Thank you.

THE COURT:  What about the previous mortgage? Are you moving that in for evidence?

MR. HAYES:  I will, Your Honor.  Yes, sir.

THE COURT:  Okay.  All right, let me have this one.

MR. HOLBER:  Do you want this marked?

THE COURT:  yeah, please mark it.

MR. HAYES:  Mark it as P1 please.

THE COURT:  All right, call your next witness then.

MR. HOLBER:  I'd like to call Winston Granville please.

MS. GAYNOR:  Yes.  Winston.

MR. HAYES:  I ask for an offer of proof, Judge.

THE COURT:  Okay, offer of proof please.

MR. HOLBER:  Mr. Granville is the son of Ms.

Gaynor and he is going to testify as to his experiences with the postal office and how mail has been received at [inaudible] residence.

MR. HAYES:  Your Honor, unless he's residing there, I'm going to object to his testimony.

MR. HOLBER:  I think...

THE COURT:  I mean, your offer of proof he's going to testify to how mail is received different than what your client had testified to that -- I mean...

MR. HOLBER:  I think he's going to be able to...

THE COURT:  I mean, she had testified that she receives it in a slot in her mailbox and that there have been different mailmen that deliver.  She didn't testify that there were multiple locations.

MR. HOLBER:  Yes, he will testify as to where mail ended up [inaudible] in a different place.

THE COURT:  Would it be this mail or just mail in general?

MR. HOLBER:  I believe mail in general.  [Inaudible]...

THE COURT:  I'll allow it.  Go ahead.

MR. HOLBER:  It will only be a few minutes, Judge.

THE COURT:  Go ahead.  I'm going to allow it.

Overruled.  Take the stand.

MR. HOLBER:  It won't take long.  Thank you, Judge.

MS. GAYNOR:  He is my son.

MR. HOLBER:  [Inaudible].

MS. GAYNOR:  Okay.

THE CLERK:  Remain standing.  Raise your right hand.  State your full name and spell your last name for the Court.

MR. GRANVILLE:  Winston Anthony Granville, G-r-a-n-v-i-l-l-e.

* * *

[Witness Sworn]

* * *

THE CLERK:  All right, keep your voice up for the Court [inaudible].

MR. GRANVILLE:  Thanks.

THE COURT:  Please proceed.

MR. HOLBER:  Thank you.

* * *

WINSTON ANTHONY GRANVILLE, having been first duly sworn, was called as a witness herein and was examined and testified as follows:

* * *

DIRECT EXAMINATION

BY MR. HOLBER:

Q.   Mr. Granville, what's your relationship to Ms. Gaynor to my right?

A.   She is my mom.

Q.   And where do you currently live in?

A.   I live in Memphis, Tennessee.

Q.   And what do you do for a living?

A.   I work for the VA...

Q.   And do you visit...

A.   ...Medical Center.

Q.   I'm sorry.  Do you visit your mother at times?

A.   Yes.

Q.   And when you visited her, did you have an occasion to find mail from the U.S. postal office at her house?

A.   Yes.

Q.   And where did you find it?

A.   It was by the garage door.

Q.   And is the garage door near the front door?

A.   Yes.

Q.   And when you found it, what condition was it in?

A.   I'm sorry, say that again?

Q.   When you found it, what condition was it in?

A.   Oh, it had been rained on.

Q.   So, do you -- and [inaudible] was in, there has been testimony that a tax of a little more than thirty

five hundred is owed to the Tax Claim Bureau.  Do you have the ability, are you willing to pay that tax should the Judge issue an order in favor of your mother from today's proceedings?

A.    Absolutely.

Q.    Did you have any knowledge as to the tax sale that was going to take place?

A.    No, I did not.

Q.    Do you know if your mother had any knowledge...

                        ***

        MR. HAYES:  Objection, Your Honor.

        THE COURT:  I'm sorry, what was the question?
I was distracted.

        MR. HAYES:  Did he know if...

        MR. HOLBER:  The question was...

        MR. HAYES:  Oh, I'm sorry.

        MR. HOLBER:  The question was, do you have any knowledge as to whether your mother had knowledge of the tax sale?

        THE COURT:  I'm going to sustain it.

        MR. HOLBER:  All right, I have no further questions, Judge.

        THE COURT:  Cross?

                        ***

                  CROSS EXAMINATION

BY MR. HAYES:

Q.   Mr. Granville, you don't have any firsthand knowledge, personal knowledge of where the tax sale notices were delivered to your mother's house in this case, right?

A.   Well, there was one particular document.  I visited her in October of '22.  There was one particular document that was there.  I think it's already stated that the property was sold.

Q.   Okay.  The tax sale notice of public sale was sent to your mother's address by certified mail return receipt requested.  You don't have any firsthand knowledge of that document, correct?

A.   No.

Q.   And the sheriff filed an affidavit indicating that he posted the property with notice of public sale.  You don't have any knowledge of that, correct?

A.   No.

Q.   The sheriff also filed an affidavit that he personally served your mother with a copy of the notice of public sale.  You don't have any knowledge of that, correct?

A.   No.

Q.   Okay.  Now, Mr. Holber asked you if you had the ability to pay three thousand some dollars if His Honor

sets aside this sale.  Do you recall him asking you that?

A.   Yes.

Q.   Okay, are you aware, sir, that it's not $3,000 that you would have to pay if the sale were set aside, but you'd have to pay the fourteen thousand or so dollars that were paid in order for the sale to be set aside?

                              ***

        MR. HOLBER:  Objection.  [Inaudible], Judge. I'm not sure at all that's the case.

        THE COURT:  Overruled.  I'm going to allow it.

                              ***

BY MR. HAYES:

Q.   You have $14,406 to pay, sir?

A.   Yes.

Q.   And where is that?  In a bank account?

A.   No.  I could put it in a bank account.

Q.   Did you have any discussions at all with your mother prior to the sale about her conversations with Mr. Josselin about the tax sale notice?

A.   No.

Q.   Do you know Mr. D?  Mr. Josselin?

A.   No.

                              ***

        MR. HAYES:  That's all I have, Judge.  Thank

you.

THE COURT:  Any follow-up?

MR. HOLBER:  No, Judge.

THE COURT:  You may step down, sir.  Anything else, gentlemen?

MR. HOLBER:  Just to move the Exhibit into admission, please.

THE COURT:  All right, the appraisal is moved into Exhibit and the mortgage.  Any objection to the mortgage coming into Exhibit?  Home equity line of credit?

MR. HOLBER:  No, sir.

THE COURT:  All right, both of them are admitted into evidence and one is P1 which is the appraisal and R16 is the home equity line of credit. What is your position, Mr. Holber, [inaudible] again. The appraisal, do you want me to hold until you submit your information?

MR. HOLBER:  Yes, please.

THE COURT:  All right.  Do you want to respond to it?

MR. HAYES:  I would like to, yes sir.

THE COURT:  Okay.  How much time do you want?

MR. HAYES:  Ten days after I receive his will be fine.

York Stenographic Services, Inc.

2303 East Philadelphia Street, York, PA 17402 - (717) 854-0077

THE COURT:  Okay, so we have a forty day hold on this one, okay?

MR. HOLBER:  Very well.

MR. HAYES:  Thank you, Judge.

THE COURT:  All right, take care.

MR. HAYES:  May we be excused?

THE COURT:  Yes.  Thank you.

MR. HAYES:  Thank you, sir.

THE COURT:  Here's all the Exhibits and everything.

*** 

[End of Proceeding]

York Stenographic Services, Inc.

2303 East Philadelphia Street, York, PA 17402 - (717) 854-0077

C E R T I F I C A T E

I, Richard Coogan, hereby certify that the proceedings and evidence are contained fully and accurately on digital multi-track recording; that the recording was reduced to typewriting by my direction; and that this is a correct transcript of the same.

_____
Richard Coogan, Director
Electronic Recording Center

YORK STENOGRAPHIC SERVICES, INC., hereby certifies that the attached pages represent an accurate transcript of the multi-track digital sound recording of the proceedings in the Court of Common Pleas of Delaware County, Pennsylvania, in the matter of:


GLORIA GAYNOR

vs.

DEL. CO. TAX CLAIM BUREAU

CV-22-007978


BY:



Jaime L. Shotwell
Transcriber for
York Stenographic Services, Inc.




The foregoing record of the proceedings upon the hearing of the above cause is hereby approved and directed to be filed.


_____
Judge

JYS/SEH

York Stenographic Services, Inc.
2303 East Philadelphia Street, York, PA 17402 - (717) 854-0077